## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

EQUARN WHITE,

                                        Plaintiff,

            v.                                          9:17-CV-1094
                                                        (LEK/ATB)

RANDEL SMITH, et al.,

                                        Defendants.

EQUARN WHITE, Plaintiff, pro se
ERIK B. PINSONNAULT, Asst. Attorney General for Defendants

ANDREW T. BAXTER
United States Magistrate Judge

### REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge.  Plaintiff brought this civil rights action asserting various constitutional claims arising from his confinement at Upstate Correctional Facility ("Upstate"). (Complaint ("Compl.")) (Dkt. No. 1).

## I.    Procedural History

After the court's initial review of the original complaint, the court allowed three claims to go forward: (1) an Eighth Amendment conditions of confinement claim against defendant Randal Smith,[1] (Dkt. No. 4 at 28-29, 42); (2) an Eighth Amendment deliberate medical indifference claim against defendant Waterson (*Id*. at 23, 42); and (3) a First Amendment retaliation claim against defendants LeClerc, Nelson, and Bernier. (Dkt. No. 4 at 34, 36-37, 42).

---

[1] Plaintiff misspelled this defendant's first name in the original complaint.  Where relevant, the court will refer to defendant Smith with the proper spelling of his first name.

On March 26, 2018, defendants Smith, Waterson, and Nelson ("SORC Nelson")[2] moved to dismiss the complaint pursuant to Fed. R. Civ. P. ("FRCP") 12(b)(6), as to any claims asserted against them. (Dkt. No. 19). Plaintiff opposed the motion and sought leave to file a 253-page amended complaint pursuant to FRCP 15(a)(2). (Dkt. Nos. 24, 28). On December 12, 2018, I recommended that the claims against defendants Waterson (medical care) and SORC Nelson (retaliation) be dismissed and that plaintiff's motion to amend be denied. (Dkt. No. 34). On March 8, 2019, the Honorable Lawrence E. Kahn modified the recommendation in part, dismissed the medical care claim against defendant Waterson, but denied the motion to dismiss plaintiff's retaliation claim against SORC Nelson. (Dkt. No. 36 at 43). Judge Kahn also allowed the plaintiff to file a proposed amended complaint with specific limitations. (Dkt. No. 36 at 18, 43-44).

On June 5, 2019, plaintiff filed his motion to amend the complaint, together with a proposed amended complaint. (Dkt. No. 44). After a review of the proposed amended complaint, the court allowed the following claims to go forward:

> (1) Eighth Amendment conditions-of-confinement claim related to Cell 18 against R. Smith.
> (2) First Amendment retaliation claims against Bernier, Nelson, and LeClerc.
> (3) Eighth Amendment excessive force claim against M. Gokey related to the September 2, 2014.
> (4) Eighth Amendment deliberate medical indifference claims against Maynard, Marinelli, Winston, Barkman, P. Baker, and H. Baker.

---

[2] During the period in question, defendants Nelson and Bernier worked at Upstate as Supervising Offender Rehabilitation Coordinators ("SORC"), and defendant Leclerc was an Offender Rehabilitation Coordinator ("ORC").

> (5) Eighth Amendment deliberate medical indifference claim
> related to his mental health medication in 2014 against Byno.
> (6) Eighth Amendment deliberate medical indifference claim
> against H. Baker related to medical treatment after the
> September 2014 incident.
> (7) Eighth Amendment conditions of confinement claims,
> related to Cells 13 and 15, against Maynard, Winston,
> Gallagher, Fournier, Eddy, L. Gokey, Marinelli, and R. Smith.
> (8) Retaliation claims against L. Gokey and R. Smith related
> to sleep deprivation and Cell 15.

(Dkt. No. 55 at 23-24).[3]  Plaintiff filed a signed copy of his proposed amended complaint, which has become the operative pleading herein, with the remaining claims noted above.[4]  (Dkt. No. 56).

Presently before the court is the defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  (Dkt. No. 75).  On May 5, 2021, the court received a letter from the plaintiff advising that he had been moved and did not have copies of his legal documents.  (Dkt. No. 79).  The court sent plaintiff the documents associated with the summary judgment motion other than his lengthy deposition, but instructed him that he could request portions of the deposition.  (Dkt. No. 80).  Plaintiff was specifically warned in the main document of the defendants' motion and in Docket # 80 that "[his]

---

[3] My Decision and Order contains only seven numbered claims because the first "claim" contained two separate issues. (Dkt. No. 55 at 23-24).  In this Report and Recommendation, I have separated what was the first claim in the Decision and Order into two separate claims.  Thus, there are eight remaining claims as listed herein.

[4] Unfortunately, contrary to the court's order, plaintiff's amended complaint contains many claims which relate to other districts, other time periods, and other facilities.  The court sifted through hundreds of paragraphs to determine the remaining relevant facts and claims.  Plaintiff's Exhibits A-X are mostly unrelated to the remaining claims and consist of a variety of affidavits, documents, and photographs. (Dkt. No. 56) (Ex. A-X).  Exhibit B was stricken from the record by court order. (Dkt. No. 55 at 24).

failure to file any response to the motion may result in the motion being granted since the court will not have the benefit of the plaintiff's response to consider in making its decision." (*See* Dkt. Nos. 75, 80).  Plaintiff has failed to respond to the motion, despite being given a sua sponte extension to do so by the court.[5] (Dkt. No. 82).

The facts in the plaintiff's amended complaint are disjointed, and the amended complaint describes incidents which allegedly occurred at various times between 2013 and 2018, even though plaintiff was directed to restrict his amended complaint to the issues remaining after Judge Kahn's March 8, 2019 order (Dkt. No. 36).  Thus, rather than stating a summary of facts at the outset, I will discuss the facts as relevant to each of the remaining claims in my analysis.

## II.    <u>Summary Judgment</u>

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a

---

[5] Plaintiff appears to have failed to file an updated change of address.  The last change of address he filed was on June 7, 2021 and prompted the court to sua sponte extend plaintiff's time to respond to defendants' motion. (Dkt. Nos. 81, 82).  Unfortunately, on June 14, 2021, the orders were returned to the court "undeliverable." (Dkt. No. 83).  The court checked the New York City Department of Corrections website, which had a different address listed than the address in Dkt. No. 81. (Dkt. No. 83).  The court mailed copies of Dkt. Nos. 81 and 82 to the address listed by the NYC Dep't of Corrections.  Although the mail was not returned "undeliverable," plaintiff has failed to respond to the defendants' motion by the court-extended deadline.

motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

As noted, plaintiff failed to oppose defendant's motion for summary judgment, notwithstanding the fact that he was notified of the consequences of failing to respond. (Dkt. Nos. 75, 80). "Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that movant is proceeding pro se." *Jackson v. Onondaga Cty.*, 549 F. Supp. 2d 204, 209 (N.D.N.Y. 2008); *Evans v. Albany Cty. Corr. Facility*, No. 9:05-CV-1400 (GTS/DEP), 2009 WL 1401645, at *6 & n.35 (N.D.N.Y. May 14, 2009) (collecting cases).

## III.   Conditions of Confinement

### A.   Legal Standards

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway*, 37 F.3d at 66 (quoting *Wilson v. Seiter*, 501 U.S. at 298). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citing *Hudson v. McMillan*, 503 U.S. 1, 9 (1992) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment violation) (internal quotations and citations omitted).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway*, 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id*.

B.    **Analysis**

1.    **Cell 18 - December 2015 - Defendant Randal Smith (Claim # 1)**

In the amended complaint, plaintiff alleges that defendant Randal Smith placed plaintiff "next to 18 cell"[6] in 2015 "to deprive sleep and failed to correct rodent problem which the plaintiff was eventually bittin [sic] by one." (Amended Complaint ("AC") ¶ 413). At his deposition, plaintiff stated that defendant Smith was one of the "instrumental pieces in keeping me next to inmate Reader [sic]" when plaintiff moved "back"[7] to Upstate. (Pl.'s Dep. at 160) (Dkt. No. 75-11).

It has been stated that sleep is "critical to human existence, and conditions that

---

[6] This has been interpreted as plaintiff being place in Cell 18. The number of the cell is not relevant to the issue herein. The central claim is that defendant Smith placed plaintiff in a cell next to inmate Razell Reeder, who was known to make a great deal of noise, allegedly preventing plaintiff from sleeping more than a few hours per night.

[7] The records indicate that plaintiff was confined at Upstate Correctional Facility ("Upstate") from approximately May 3, 2014 to September 25, 2014 and, after over a year at Green Haven Correctional Facility ("Green Haven"), plaintiff was transferred back to Upstate from approximately December 17, 2015 to March 21, 2016. (Declaration of AG Pinsonnault ("Pins Decl.") Exh. C).

prevent sleep have been held to violate the Eighth Amendment." *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) (citing cases). Vague, conclusory, and unsupported allegations do not raise a triable issue of fact as to whether the noise level was "objectively sufficiently serious for purposes of a conditions of confinement claim." *See Phelan v. Durniak*, No. 9:10-CV-666 (FJS/RFT), 2014 WL 4759937, at *10 (N.D.N.Y. Sept. 24, 2014) (citations omitted).

In the amended complaint, plaintiff alleges that he was placed near or next to inmate Reeder twice by defendants Smith, once in May of 2014 in Cell # 15, and again after plaintiff was returned to Upstate in December of 2015, while plaintiff was in Cell # 18.[8] The plaintiff's first claim deals only with the December 2015 placement, plaintiff claims that he was near or next to Inmate Reeder for approximately one month, but there is no indication that plaintiff suffered any adverse effects as the result of the loss of sleep,[9] other than "peace of mine [sic]."[10] (AC ¶ 210 & 210(B)).

In addition, during his deposition, plaintiff stated that Inmate Reeder could "annoy a whole company." (Pl.'s Dep. at 148). It appears that the proximity to Inmate Reeder may not have made any difference to plaintiff's ability to sleep. Plaintiff also testified, without any supporting evidence, that defendant Smith was "one of the instrumental pieces [sic]" in keeping plaintiff next to inmate Reeder. (Pl.'s Dep. at

---

[8] The Eighth Amendment claim is separate from the Retaliation claim involving the same conduct. Plaintiff claims that being placed next to Inmate Reeder was, in itself, an Eight Amendment violation. However, he also claims that he was placed next to inmate Reeder in retaliation for grievances that he filed. The plaintiff's various retaliation claims are discussed below.

[9] Plaintiff claims that he was able to get two to three hours of sleep per day. (AC ¶ 250(B)).

[10] Plaintiff's allegations regarding the 2014 placement did elaborate on "injuries" that he suffered as a result of his lack of sleep. I will discuss the 2014 placement below.

160). He stated that "the problem is sleep." (Pl.'s Dep. at 160). Such general

allegations are insufficient to state a constitutional claim. *See Little v. City of New York*,

No. 16 Civ. 0780 (PAE/JCF), 2017 WL 713895, at *5 (S.D.N.Y. Feb. 3, 2017) (citing

inter alia *Youmans v. Schriro*, No. 12 Civ. 3690, 2013 WL 6284422, at *5 n.3

(S.D.N.Y. Dec. 3, 2013) (general allegations of conditions that merely interfere with

sleep insufficient)). *Cf. Mena v. City of New York*, No. 13-CV-2430 (RJS), 2014 WL

4652570, at *4 (S.D.N.Y. Sept. 18, 2014) (detailed allegations of unconstitutional

conditions of confinement, including overcrowded cell resulting in substantial lack of

sleep).

Plaintiff alleges that when he returned to Upstate (in December of 2015) he told

defendant Smith that plaintiff hoped that Smith was not "moving [him] next to inmate

Reeder," and that defendant Smith said "no." (Pl.'s Dep. at 160-61, AC ¶ 209).

Defendant Smith states in his declaration, that an inmate's cell placement was not

solely his decision, and as discussed further below, during 2014 and 2015, Upstate was

full. (Smith Decl. ¶ 7) (Dkt. No. 75-9). There were limited options for placement of any

inmate. (*Id*.) Inmate Reeder was assigned to a single cell, and during his 2014 stay at

Upstate, plaintiff had required a single-cell. (*See* Marinelli Decl. Ex. C) (Dkt. No. 76-

1). Plaintiff may have been placed next to Inmate Reeder in 2015, in part, because both

inmates required a single cell.[11] There is no indication that defendant Smith was solely

---

[11] Defendant Smith also states in his declaration that Upstate was a double-bunk facility. (Smith
Decl. ¶ 5). There were several criteria to consider when finding a suitable cell-mate for an inmate,
including height, weight, age, and any known gang affiliations. (*Id*.) Defendant Smith states that, to
the extent that he made any decisions regarding plaintiff's placement, they were made in accordance
with facility policy and in an effort to decrease the risk of any violent or any other dangerous incident
in the cell. (*Id*.) Since plaintiff had a history of making "homicidal" statements regarding cell-mates,

responsible[12] for plaintiff's placement in Cell # 18, nor that he was deliberately indifferent to a serious risk to plaintiff's health as a result of his placement near Inmate Reeder.

Plaintiff claims that on December 30, 2015, he spoke to defendant Smith about "moving" and asked defendant Smith to get an exterminator because there were mice and "rats" in his cell. (AC ¶ 210(A)). Plaintiff states that the mice would climb up on his bed to retrieve the bread that plaintiff had saved under the mattress. (AC ¶ 210 (B)). Plaintiff claims that he was "eventually" bitten by a mouse because defendant Smith was somehow responsible for failing to correct the rodent problem in the housing unit. (AC ¶¶ 210(B); 413). During his deposition, plaintiff stated that he told defendant Smith to "fix the conditions." (Pl.'s Dep. at 161).

In his declaration, defendant Smith states that he did not ignore a rodent problem at Upstate. (Smith Decl. ¶ 12). He states that Upstate had rodent traps, access to extermination services, and means by which inmates could report rodent issues. (*Id.*) Plaintiff has failed to respond to the defendants' motion to contest any of the sworn facts in their declarations. Although plaintiff states that he was bitten by a mouse, he does not claim any adverse affect resulting from the bite, and he does not describe how

---

plaintiff would have been placed in a single cell. However, defendant Smith did not have an independent recollection of plaintiff being in a cell next to Inmate Reeder. (Smith Decl. ¶ 8). Defendant Smith also states that he was never made aware of any excessive risk to plaintiff from being housed next to Inmate Reeder, during either 2014 or 2015, and he had no intention of disturbing plaintiff's sleep, nor of "punishing" him for any reason. (*Id.*)

[12] In order to be liable under section 1983, a defendant must be personally responsible for the unconstitutional conditions. *Tangretti v. Bachmann*, 983 F.3d 609, 619 (2d Cir. 2020) (plaintiff must establish that the defendant violated the Eighth Amendment by his own conduct, he must know of and disregard an excessive risk to plaintiff's health or safety).

the "rodent" problem rose to the level of cruel and unusual punishment. The court must also point out that, if plaintiff was saving bread under his mattress, he could have been exacerbating the rodent problem himself. Defendant Smith could not be responsible for plaintiff placing food under his mattress. Thus, plaintiff has failed to raise a genuine issue of material fact with respect to the conditions of his confinement in or near Cell # 18 in December of 2015, and any such claims may be dismissed as against defendant Smith.

> ### 2. Cell ## 13 and 15 - May through September of 2014 - Defendants Maynard, Winston, Gallagher, Fournier, Eddy, L. Gokey, Marinelli, and R. Smith (Claim # 7)

> #### a. Cell # 13

Plaintiff claims that in May of 2014, defendants Maynard, Winston, Barkman, Marinelli, and Gallagher placed plaintiff in a dirty cell, with "body waste" all over the mattress, toilet, and shower area in the corners. (AC ¶ 410). Plaintiff also alleges that the cell was "freezing," he was not given sheets, wash rag, towel, pillow/pillowcase, and he was not provided any clothing. (*Id.*) Plaintiff claims that he was given a pillow, towel, and wash rag after two and one half months. (*Id.*) Plaintiff also alleges that defendant Fournier refused to give him cleaning supplies, allegedly because plaintiff made defendant Gallagher "mad" when plaintiff tried to kill himself. (AC ¶ 411). Although plaintiff's causes of action generalize the claim against the named defendants, the fact section of the complaint and plaintiff's deposition show that each of the defendants was only involved at specific times during the short time that plaintiff was housed in Cell #13.

In the fact section of the amended complaint, plaintiff claims that when he transferred from Downstate to Upstate, he was taken to a holding cell, where he told Officer Scott that he was "homicidal" and "suicidal." (AC ¶ 71).   As a result, plaintiff was placed in a "holding cell." (AC ¶ 72).  Plaintiff claims that Officer Scott spoke with defendant Byno, who suggested that plaintiff be sent to the infirmary for "OMH"[13] watch.[14] (*Id.*)  Plaintiff states that he was on "OMH watch" until May 5, 2014, when he told defendant Maynard that he was still homicidal and would likely hurt any cell mate. (AC ¶ 73).  Plaintiff claims that he was brought to Cell # 13, but the inmate who was in the cell would not let plaintiff in, so the inmate was taken to a different cell, while plaintiff was left alone in Cell #13. (AC ¶¶ 74-75).  Plaintiff claims that when he was placed in Cell # 13, the cell was cold because the ventilation system was blowing cold air, and he was not given any sheets, blanket, wash rag, towel, or pillow.  The cell was dirty, and there were urine stains in the corners of the cell, toilet rim, and shower. There were urine and semen stains on the mattress, and plaintiff alleges that defendant Maynard denied him any supplies. (AC ¶ 76).  Plaintiff states that he laid in the "fetal position" all day and night, and that the cell was "constantly illuminated." (*Id.*)

Plaintiff alleges that on May 6, 2014, defendants Winston and Gallagher delivered breakfast at 7:40 a.m., and plaintiff told them that he needed cleaning supplies because the cell was filthy, and he needed sheets and the other supplies listed above. (AC ¶ 77).  Plaintiff claims that defendant Winston and Gallagher told plaintiff

---

[13] Office of Mental Health.

[14] Plaintiff states that Officer Scott, who is not a defendant herein, suggested that plaintiff simply be placed in a single cell. (AC ¶ 72).

they would see what they could do, and then they walked away. (*Id.*)  Later on during the day, while plaintiff was in a mental health interview with defendants P. Baker and Barkman, plaintiff claims to have asked about the above supplies. (AC ¶ 83).  Plaintiff claims that these defendants told him to ask the guards, but when plaintiff stated that he had already done that, defendants P. Baker and Barkman told him that "it is what it is." (*Id.*)  After the interview, plaintiff states that he was brought back to Cell # 13 by defendants Winston and Gallagher. (AC ¶ 84).  Plaintiff asked them for a new T-shirt because there was blood on the one he was wearing and he informed them again that he needed cleaning and other supplies. (*Id.*)  Plaintiff also asked them for his "personal property," because it had been longer than 72 hours since he was transferred to Upstate, but he was told that it was "not going to happen." (*Id.*)

Plaintiff alleges that, at approximately 5:00 or 6:00 p.m. on May 6, 2014, defendant Fournier "was doing cell clean up." (AC ¶ 86).  Plaintiff states that he asked defendant Fournier for cleaning supplies, but defendant Fournier denied the request, whispering to plaintiff that he should not have "piss [sic] officer Gallagher off." Plaintiff claims that defendant Fournier "saw" that plaintiff's cell was filthy and that he had nothing in the cell but a mattress. (*Id.*)  Plaintiff states that on May 8, 2014, he received a towel, two sheets, a blanket, and a pillowcase, but he was told that no pillows were currently available, and there were no wash rags "up front." (AC ¶ 86). Plaintiff repeats his statement that the cell was "constantly illuminated." (*Id.*)  Plaintiff states that he was given his personal property on May 10, 2014.[15] (AC ¶ 87).

---

[15] Claims regarding the delay in providing plaintiff with his personal property have been dismissed. (Dkt. No. 55 at 13-14).

During plaintiff's deposition, he testified that he was in Cell # 13 for a month, and that the dirty conditions in Cell #13 lasted for a week, but then he stated that "I think within five days, I was able to clean up the cell." (Pl.'s Dep. at 144-45, 157). A "good officer" provided plaintiff with "everything" at that time. (Pl.'s Dep. at 146).

Defendants first argue that plaintiff's Eighth Amendment claim is barred by the statute of limitations because the events forming the basis of this claim occurred in May of 2014, and plaintiff filed his original complaint on October 2, 2017. (Def.'s Br. at 22). The statute of limitations for section 1983 actions is three years after the plaintiff's cause of action accrued. *See Owens v. Okure*, 488 U.S. 235, 240-41 (1989). "While state law supplies the statute of limitations for claims under § 1983, federal law determines when a federal claim accrues. The claim accrues when the plaintiff knows or has reason to know of the harm." *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994) (internal quotation marks and citation omitted).

Defendants are correct in arguing that plaintiff knew or should have known of the harm at the time he was subjected to the allegedly unconstitutional conditions in Cell # 13 in May of 2014, and the statute of limitations would have run three years later in May of 2017.[16] Therefore, plaintiff's claims relative to the conditions in Cell #13 would be time barred because his original complaint was not filed until October 2, 2017. (Dkt. No. 1).

However, the court must also determine whether the statute of limitations was

---

[16] Although plaintiff stayed in Cell # 13 until May 27, 2014, he testified that within five days to one week of his placement, his cell was cleaned and he was given his property on May 10, 2014. Thus, any conditions of confinement claim would have accrued on or before May 10, 2014.

tolled during any part of the three year period.  The Second Circuit has held that the statute of limitations for an inmate's section 1983 claim must be tolled while the inmate is actively exhausting his administrative remedies. *Gonzalez v. Hasty*, 651 F.3d 318, 323-24 (2d Cir.2011).  In this case, plaintiff has attached as Exhibit A, two Central Office Review Committee ("CORC")[17] decisions, one dated October 15, 2014, denying a grievance, which the CORC form indicates was filed on May 19, 2014, and the second dated December 3, 2014, which states that the grievance was filed on May 6, 2014. (Pl.'s Ex. A) (Dkt. No. 56-2).

Although plaintiff has not filed the grievances themselves, he claims in the amended complaint that he filed various grievances while he was in Cell #13, and they were consolidated for review. (AC ¶ 88).  It appears from reading the CORC decisions in Exhibit A, that plaintiff raised his challenge to the Cell # 13 conditions of confinement in these grievances.  In its October 15, 2014 decision, the CORC stated that

> all empty cells are cleaned and inspected for issues prior to another inmate housing there. It is noted that the grievant was placed in SHU on 5/4/14 and also had the opportunity for dry and wet clean up on 5/5/14 and 5/6/14 respectively.  CO F . . . denies denying the grievant cleaning supplies, meals or barbershop access on 5/6/14 and states that he did not complain about unsanitary conditions that day and had all state issued items to which he was entitled. . . . It is noted that his property was issued to him on 5/10/14 after arriving at the facility separately, and the area supervisor does not recall any complaints about cold air flowing out of the vents.

---

[17] The CORC is the highest level of an inmate's administrative remedy procedure in New York State. N.Y. Comp. Codes R. & Regs., tit. 7 § 701.5(d).

(Pl.'s Ex. A at 1). In its December 3, 2014 decision, the CORC again stated that "CO F. . ." denied refusing plaintiff access to barbershop, cell cleanup, or meals on May 6, 2014. (Pl.'s Ex. A at 2). Thus, plaintiff was actively exhausting his administrative remedies with respect to the conditions in Cell # 13 from May 6, 2014 until December 3, 2014, and the statute of limitations would have been tolled. If the statute of limitations was tolled until December 3, 2014 or even if it were only tolled until October 15, 2014, then plaintiff's claims with respect to the conditions in Cell #13 are timely. Notwithstanding plaintiff's timely filing, his conditions of confinement claim with respect to Cell #13 may be dismissed on the merits.

The temporary or limited exposure to conditions that fall below the "contemporary standards of decency" do not amount to Eighth Amendment violations. *See Ford v. Phillips*, No. 05 Civ. 6646, 2007 WL 946703 (S.D.N.Y. Mar. 28, 2007) (finding that, as a matter of law, minor and temporary deprivations of property, showers and recreation "in no way involved the severity of treatment which must be shown to make out a case of cruel and unusual punishment."). In this case, even though plaintiff repeated the alleged deprivations in multiple paragraphs of his amended complaint, ultimately, plaintiff conceded that he was subject to the allegedly unconstitutional conditions for only a few days. He moved into Cell # 13 on May 5, 2014, but by May 8, he testified that he had everything but a pillow, in five days he was able to clean his cell, and by May 10, he had been given his personal property. Plaintiff alleges that there were stains on his mattress and urine stains in the corners of the room. While unpleasant and perhaps unsanitary, such deprivations do not rise to the level of unconstitutional conditions. Plaintiff claims that he was "freezing," however, he was

16

housed in Cell #13 in May.  While it may have been cold until he was given a blanket three days later,[18] it is unlikely that plaintiff suffered freezing temperatures in his cell. Plaintiff has failed to allege that he was subjected to unconstitutional conditions of confinement in Cell # 13, and any such claims may be dismissed against all defendants.

### b.    Cell # 15

Plaintiff also alleges that defendants Smith, Eddy, Gokey, and Marinelli placed plaintiff next to "a mentally ill" inmate to deprive him of sleep and to psychologically torture him. (AC ¶ 412).  Plaintiff alleges that on May 27, 2014, he was told that he would be placed in a "single cell," and he would be transferred from Cell # 13 to Cell #15. (AC ¶ 89).  Plaintiff states that he was told that "security" made the decision to move him and to keep him in a single cell.[19] (*Id.*)

While plaintiff exhausted his administrative remedies with respect to conditions in Cell #13, thus tolling the statute of limitations with respect to those claims, it is unclear whether the same is true for plaintiff's claims about the "conditions" in Cell #15.  Plaintiff states that he was transferred to Cell #15 on May 27, 2014.  Neither of the grievances that are attached to the amended complaint as Exhibit A could have referred to the conditions in Cell #15 because both grievances were filed before May

---

[18] For purposes of this analysis, the court assumes, without finding, that plaintiff was given bedding on May 8, as he stated during his deposition.  The court is aware that Upstate Correctional Facility is in Malone, New York, and the temperatures may be colder than in other parts of the state, it is unlikely that plaintiff would have been subjected to freezing temperatures in May for an extended period of time during the day.  The average low temperature in May in Malone, New York is 45.1 degrees Fahrenheit. https://www.weather-us.com/en/new-york-usa/malone-weather-may#temperature

[19] This should not be a surprise to plaintiff since on May 6, 2014, he told defendant Marinelli that he was "homicidal" and did not want a "bunky." (Marinelli Decl. Ex. C).  After plaintiff was told that he would be placed in a single cell "per security," "Pt now says he will not need OMH again." (*Id.*)

27, 2014. Once the defendant demonstrates that the statute of limitations has facially

run, the burden is on plaintiff to establish tolling. *Whyte v. Tompkins Cty. Sheriff*, No.

9:20-CV- 284 (LEK/CFH), 2020 WL 4732101, at *6 (N.D.N.Y. Aug. 14, 2020) (citing

*Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007)).

   In this case, plaintiff claims that the "defendants" placed him in Cell #15,

knowing that the inmate in the next cell was mentally ill and would make noise

consistently, keeping the plaintiff awake. Plaintiff asserts a wide variety of adverse

effects that he allegedly suffered as the result of the lack of sleep. Any cause of action

would have accrued when plaintiff was placed in the cell and became aware that he was

suffering as the result of the inmate's noise. In his amended complaint, plaintiff states

that shortly after he was moved to Cell #15, he began to hear "banging." (AC ¶ 90). At

the latest, plaintiff's cause of action would have accrued the day that he was transferred

out of Cell #15 and out of Upstate Correctional Facility on September 25, 2014.

   Unlike his challenge to the conditions in Cell # 13, plaintiff has not filed any

grievance decisions or other documents, showing that he challenged his placement in

Cell #15 or complained about the adverse effects that he was suffering as the result of a

lack of sleep. Unlike the failure to exhaust per se,[20] which the defendants have the

burden to establish, the burden of establishing tolling, equitable or otherwise, is on the

plaintiff who asserts that the statute of limitations is tolled. *White, supra* (equitable

tolling); *Weatherwax v. Barone*, No. No. 3:19-CV-1502(KAD), 2021 WL 4125452, at

*4 (D. Conn. Sept. 9, 2021) (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007))

---

[20] Defendants do not argue failure to exhaust as a defense.

(exhaustion of administrative remedies).

Plaintiff has failed to respond in opposition to the defendants' motion for summary judgment.  In the amended complaint, plaintiff vaguely refers to a grievance that he filed on September of 2014: "on 9/8/14 plaintiff filed an [sic] grievance about not being moved to level 3 and his neighbor denying him sleep."[21]  (AC ¶ 114).  If true, plaintiff appears to have waited approximately three months to file a grievance, notwithstanding his claim that he was being driven to suicide over the noise.[22]  Plaintiff does not include a grievance number, nor does he include any documents that would substantiate his statement.  Thus, there is no evidence that statute of limitations was tolled by exhaustion of administrative remedies, and the plaintiff's claim relative to his placement in Cell #15 may be dismissed as barred by the statute of limitations.

In any event, defendant Smith states in his declaration, that he was not alone responsible for an inmate's placement in either 2015 or 2014. (Smith Decl. ¶ 5).  To the

---

[21] According to defendant Smith, an inmate begins on PIMS (Progressive Inmate Movement System) level 1, and if he receives no disciplinary tickets within 30 days, he may be moved "up" to an area reserved for PIMS level 2. (Smith Decl. ¶ 9; *See* DOCCS Directive # 4933, 7 N.Y.C.R.R. Ch. VI, § 303 - Standards for Special Housing Units ("SHU")).  According to Directive # 4933, PIMS is a behavioral incentive program in SHU whereby an inmate who completes a period free of regressions, deprivation orders, or misbehavior reports may increase their PIMS level and accordingly their privileges - while an inmate is designated PIMS level 1 for 30 days, there is no indication that a level increase is automatic upon the passage of time - § 303.1 (a)-(c)).  Plaintiff believed that he was not being moved quickly enough according to the PIMS schedule. (AC ¶ 113) (Plaintiff claims that on September 19, 2014, he asked defendant Smith why he had not been moved to "PIMS 3.")  Plaintiff states that he was told that he was on PIMS 3 hold, and he needed to "ask security," which plaintiff speculated was defendants Smith, L. Gokey, and Eddy. (*Id.*)  Plaintiff stated that defendant Smith told plaintiff there were no available cells, but plaintiff "knew" that one of the cells was "unoccupied." (*Id.*)

[22] During plaintiff's deposition, he stated that he filed a grievance about defendant Smith "after" he was in Cell # 15, but plaintiff was not clear on the timing. (Pl.'s Dep. at 156).  "That's before – that's not –  this was not what – this is – this is when I was in – yeah, I think in cell fifteen and in a different cell because I was moved – I was eventually . . . ." (*Id.*)

extent that defendant Smith was involved in any placement, particularly in 2014, there were clearly considerations regarding the requirement that plaintiff be housed in a single cell based on his own statements to corrections officials that he would likely hurt any cell-mate. Defendant Laura Gokey has filed a similar declaration, stating that she was not solely responsible for inmate placement, notwithstanding her position as a Sergeant in 2014. (L. Gokey Decl. ¶ 5) (Dkt. No. 75-3). Defendant L. Gokey reiterates that in 2014, Upstate was full, and the options for placing inmates were limited. (L. Gokey Decl. ¶ 6). "Space constraints were a substantial factor" in such placement. (*Id.*) Defendant L. Gokey has no independent recollection of plaintiff or the alleged incidents in this case, however, she states that she was never made aware of an excessive risk to plaintiff based on his cell placement at Upstate.[23] (L. Gokey Decl. ¶ 7).

   In the amended complaint, the only statement that plaintiff made about defendant Eddy was that he "spoke" with Eddy and requested to be moved to level 3 and told him about Reeder. (AC ¶ 95). Plaintiff claims that defendant Eddy told plaintiff he would be "moved shortly," but it never happened. (*Id.*) During plaintiff's deposition, he stated that defendant Eddy "left [him] next to Reeder, knowing he was binging [sic]." (Pl.'s Dep. at 165). Plaintiff has named defendants based on the fact that he may have

---

[23] In the amended complaint, plaintiff alleges that, after L. Gokey interviewed him about an alleged sexual assault in September 2014, she was escorting him back to his cell, and he asked her why other inmates who came "after" him were being moved, and she told him it was because they did not file grievances. (AC ¶ 109). Plaintiff states that defendant L. Gokey told him to "let it go" when he asked to file criminal charges against the perpetrators of the assault, but plaintiff then assumes that she meant that he would get a misbehavior report if he pursued the grievance. (AC ¶ 108). The amended complaint is filled with plaintiff's interpretations of what a defendant "meant" when he or she spoke to plaintiff. Plaintiff then told defendant L. Gokey that his neighbor was depriving him of sleep, and she stated that she would "see what she could do," but did not do anything.

mentioned his situation to them, but they did not act quickly enough or remedy the perceived problem.  There is no indication that defendant Eddy[24] or defendant L. Gokey[25] were in a position to change plaintiff's cell location when he requested it or intentionally placed him near Inmate Reeder to "torture" the plaintiff.  As stated above, the defendant must be personally involved in the alleged constitutional violation and must have the requisite state of mind in order to be held liable. *Tangretti*, *supra.*  Thus, any claims relating to plaintiff's placement in Cell # 15 may be dismissed as against all defendants.

## IV.    Medical Care (Claims ## 4, 5, 6) (Defendants Maynard, Marinelli, Winston, Barkman, P. Baker, H. Baker, and Byno)

### A.    Legal Standards

In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard.  *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the

---

[24] Defendant Eddy has not filed a declaration in support of the defendants' motion.  However, it is clear from the amended complaint and from plaintiff's deposition that any claims against defendant Eddy were speculative and based solely on plaintiff's assumption that this defendant was involved in plaintiff's placement and plaintiff's assumption that by mentioning his problem to the defendant that he was in a position to immediately rectify the situation.  Thus, the complaint may be dismissed as against defendant Eddy without relying on a declaration by the defendant.

[25] At his deposition, plaintiff clarified that his claim against defendant L. Gokey for keeping him next to Reeder were more in the nature of retaliation for his alleged grievances against "her husband," which will be discussed below. (Pl.'s Dep. at 161-62).

defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

### 1.    Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Benjamin v. Pillai*, 794 F. App'x 8, 11 (2d Cir. 2019) (citing *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Salahuddin*, 467 F.3d at 279. The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 844–47 (1994)).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32–33 (1993)). If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith*, 316 F.3d at 185–86). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith*, 316 F.3d at 185). The court in

*Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability.  *Id.* at 280.

### 2.    Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind."  *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300 (1991)).  In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care.  *Id.* (citing *Farmer*, 511 U.S. at 835–37).  Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition.  *Id*.  Deliberate indifference is equivalent to subjective recklessness.  *Id.* (citing *Farmer*, 511 U.S. at 839–40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety.  *Abreu v. Lipka,* 778 F. App'x 28, 32 (2d Cir. 2019) (quoting *Smith,* 316 F.3d at 184).  The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer*, 511 U.S. at 837).  The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent."  *Farmer*, 511 U.S. at 844. The court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively

unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Riddick v. Maurer,* 730 F. App'x 34, 38 (2d Cir. 2018) (quoting *Chance*, 143 F.3d at 703). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Because plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id.; see also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (noting that negligence is not actionable under § 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

### B.    Analysis

Plaintiff alleges that defendants Marinelli, Winston, Barkman, P. Baker, and H. Baker failed to send plaintiff to a mental observation cell and failed to allow him to see a psychiatrist after "knowing" that plaintiff was suicidal, homicidal, and had just cut his

wrist in a suicide attempt, exposing him to a "potential" risk. (AC ¶ 400).  Plaintiff claims that defendants H. Baker and Marinelli, "intentionally conspired" to have plaintiff stop taking his psychiatric medication by giving him "wrong poisonous pills" so that he could be taken off Marinelli's "case." (AC ¶ 404).  The pills made plaintiff throw up, "etc." (*Id.*)  Plaintiff claims that defendant Byno failed to give plaintiff his medication for 17 days. (AC ¶ 405).  Finally, plaintiff alleges that he was not given proper medical treatment by defendant H. Baker after plaintiff was assaulted by officers on September 2, 2014.

In the factual portion of his amended complaint, plaintiff states that when he was transferred to Upstate, on May 3, 2014, he spoke to defendant Nurse Byno and told her that he had attempted suicide at his previous facility, and that he was on mental health medication. (AC ¶ 70).  Notwithstanding this information, plaintiff was escorted to Cell #13. (*Id.*)  Later, plaintiff told Officer Scott[26] that he was "homicidal" and "suicidal" and that he would hurt any cell mate. (AC ¶ 71).

According to plaintiff, because of this statement, he was taken out of Cell #13 and taken to a holding area.  Officer Scott spoke to defendant Nurse Byno, and although Officer Scott simply suggested that plaintiff be placed in a single cell, defendant Byno sent plaintiff to the infirmary on OMH watch. (AC ¶ 72).  Plaintiff claims that he came out of the infirmary on May 5, but told defendant Maynard that he was still "homicidal" and would likely hurt a cell mate. (AC ¶ 73).  As stated above, plaintiff states that he was ultimately placed alone in Cell #13, after the inmate who was

---

[26] Officer Scott is no longer a defendant herein.

25

in Cell #13 was moved to a different cell. (AC ¶¶ 74-75).

Plaintiff alleges that, on May 6th, he told defendant Marinelli that he was still homicidal and suicidal, and that he was hearing voices, but that defendant Marinelli told him he was not homicidal, and he was not hearing voices. (AC ¶ 78). Plaintiff claims that shortly after defendant Marinelli left plaintiff's cell, defendant Winston stopped at his cell to ask plaintiff if he wanted to use a shaving razor because it was "shower day." (AC ¶ 79). Plaintiff accepted the razor, but then broke it into pieces and tried to cut his wrist. (*Id.*) Two minutes later,[27] defendant Winston came back and took plaintiff to an interview room, where defendant Barkman told plaintiff to stop cutting his wrist. (*Id.*)

Plaintiff claims that, another two minutes later, he was taken to the nurses' station. (AC ¶ 80). At the nurses' station, plaintiff states that he told P. Baker and H. Baker that he was suicidal. (*Id.*) Plaintiff claims that defendant Marinelli came to the nurses' station, mocked plaintiff, and told defendant P. Baker that Marinelli was not going to send plaintiff to an OMH Satellite,[28] and he did not consider plaintiff's act as an attempt to take his life. (AC ¶ 81). Eight minutes later, after plaintiff's wrist had been bandaged, plaintiff was sent to an interview room, where he allegedly told defendant Barkman that plaintiff had received "threat tickets"[29] on May 3 and May

---

[27] Plaintiff has written the exact times in the amended complaint. The court has noted the time only to demonstrate the speed at which the defendants reacted to plaintiff's situation, even according to plaintiff's own account.

[28] An OMH "satellite" would have been an outside facility.

[29] The court assumes that plaintiff meant that he received misbehavior reports for threatening someone.

4.[30] (AC ¶ 82).  Plaintiff also told defendant Barkman that he was not getting the proper mental health treatment. (*Id.*)  Plaintiff alleges that he told defendant P. Baker that he tried to hang himself three weeks earlier while he was still at Downstate Correctional Facility. (AC ¶ 83).  Plaintiff told defendant P. Baker about his placement on OMH Watch from May 3 through May 5. (*Id.*)  Plaintiff explained that he was currently on anti-depressants, and that he still felt homicidal and suicidal.[31] (*Id.*)  After the interview, plaintiff was brought back to Cell #13. (AC ¶ 84).

Plaintiff alleges that after he was transferred to Cell #15, and placed next to Inmate Reeder, after months of banging and other deprivations, plaintiff began to suffer hallucinations, confusion, loss of impulse control, and migraines. (AC ¶¶ 91-95). Plaintiff became depressed and suicidal, and on September 1, 2014, he attempted to make a noose to hang himself. (AC ¶ 97).  Plaintiff claims that an officer happened to come by plaintiff's cell and saved his life, after which he was sent to the infirmary for mental health observation. (*Id.*)  On September 2, 2014, while he was still on observation status, plaintiff claims that defendant Byno came to his cell to ask him why he tried to kill himself, and plaintiff told her that his "mental health" [sic] being discontinued was a factor. (AC ¶ 98). Plaintiff also claims that after defendant Byno's visit on September 2, 2014, he was assaulted, sexually and otherwise, by defendant M. Gokey and other John Doe officers. (AC ¶¶ 101-103).

---

[30] It is unclear who plaintiff claims to have threatened since he only arrived at Upstate on May 3, 2014.  Plaintiff does not elaborate on these "tickets," only to mention later that they were "dismissed" by defendant Barkman. (AC ¶ 125).

[31] As stated above, plaintiff also told defendant P. Baker about the lack of supplies in Cell #13, but defendant Baker told plaintiff to ask the guards about supplies, stating that "it is what it is," when plaintiff told defendant Baker that he had already asked the guards. (AC ¶ 83).

Plaintiff alleges that, on September 10, 2014, he was in a great deal of pain due to the sexual assault. (AC ¶¶ 105, 106).  Plaintiff alleges that he was "on his door for sick call" between 6:00 and 7:00 p.m. (AC ¶ 106).  Plaintiff states that he told defendant H. Baker that his anus and his testicles hurt, but before he could explain further, defendant Baker walked away. (*Id.*)  However, at approximately 10:00 p.m., defendant L. Gokey "pulled plaintiff out for an interview." (AC ¶ 107).  Defendant L. Gokey had defendant H. Baker took pictures of plaintiff's body, but refused to take pictures of his anus and his swollen testicles.  "She" stated that "obvious injuries look normal and fail [sic] to issue pain meds or have plaintiff stitch [sic] up." (*Id.*)

Defendants again argue that plaintiff's medical care claims are time-barred because they accrued, if at all, prior to October 2, 2014, and plaintiff filed this action on October 2, 2017.  Plaintiff's Exhibit A, shows that he did include some challenges to his medical care in his May 19, 2014 grievance, which was, in part, entitled "Nurse Denied Medication." (Pl.'s Ex. A).  The CORC response referred to an RN B, who assessed plaintiff on multiple dates in May of 2014, and determined that plaintiff "did not require treatment." (Pl.'s Ex. A at 1).  The CORC response also referred to RN B as "he," so plaintiff could not have been referring to defendant Byno, whose first name is Michele and who is a woman.[32]

Plaintiff has failed to include his original grievance documents, and it is impossible to determine the exact claims that were made therein.  The parties have confused the issue in such a way as to make it impossible for the court to determine

---

[32] During his deposition, plaintiff consistently referred to Nurse Byno as "she." (*See e.g.* Pl.'s Dep. at 134) (referring to Nurse Byno as "Ms." and "she.")

whether the statute of limitations would have been tolled with respect to the medical care that plaintiff received in May of 2014. The court will therefore, consider the merits of plaintiff's claims.

The amended complaint states that Nurse Byno allegedly denied plaintiff his mental health medication from October 14, 2014 until October 31, 2014. (AC ¶¶ 133-35). Plaintiff filed this action on October 2, 2017, thus, if defendant Byno denied plaintiff medication between October 14, 2014 and October 31, 2014, plaintiff's claim would be timely.[33] Plaintiff states that he filed a grievance, and the CORC found that his medication prescription was "renewed" on 10/10/14, 11/7/14, and 5/20/15. Defendant Byno has filed a declaration, stating that, as a nurse, she has no authority to prescribe or to discontinue a prescription for medication. (Byno Decl. ¶¶ 6-7) (Dkt. No. 76-2). In addition, defendant Byno does not recall ever failing to give plaintiff a medication that was duly prescribed by a physician. (Byno Decl. ¶ 8). Defendant Byno states that she has no recollection of treating plaintiff at any time during his stay at Upstate. (Byno Decl. ¶ 9).

However, the plaintiff's medical records reveal that on September 1, 2014, defendant Byno made an entry noting that plaintiff complained of hearing voices and

---

[33] Plaintiff claims that when defendant Byno was making her rounds on October 14, 2014 to deliver medications, she walked by the plaintiff's cell without giving him any medications. (AC ¶ 133). Plaintiff claims that he asked defendant Byno about his medications on October 16, 2014, but she told plaintiff they were "discontinued." (AC ¶ 134). The following week, on October 23, 2014, plaintiff claims that he asked defendant Byno about his medication, and she showed plaintiff a letter from "Timothy Kemp" stating that plaintiff had been receiving his medication regularly. (AC ¶ 135). Plaintiff claims that defendant Byno was lying about giving plaintiff his medications and lied to someone who investigated "the grievance" because the grievance response stated that the medication was "unavailable." (AC ¶ 136). Plaintiff assumes that because this statement was included in the grievance response, defendant Byno must have told the investigator that the medication was unavailable.

expressed thoughts of self-harm. (Byno Decl. ¶ 9 & Ex. A).  Defendant Byno further

stated that plaintiff had a piece of sheet tied to his cell door. (*Id.*)  The record further

indicates that on September 1, 2014, defendant Byno completed an OMH 1:1 referral,

and plaintiff was transferred to the infirmary for a 1:1 watch. (*Id.* & Ex. A).  In his

amended complaint, plaintiff states that defendant Byno sent plaintiff for an OMH 1:1

watch in early May based on his initial interview statements regarding suicide and

homicide.[34] (AC ¶ 70, 72).  Either way, defendant Byno was clearly attempting to treat

plaintiff, to the extent that she was authorized to do so, based on his suicidal and

homicidal statements. Thus, to the extent that defendant Byno did have some contact

with plaintiff, there is no indication that her conduct violated plaintiff's right to proper

medical care.[35]  Once again, plaintiff has failed to respond to the defendant's sworn

statements, nor has he contradicted the medical records presented.  Thus, plaintiff's

claims of deliberate indifference may be dismissed as against defendant Byno.

Plaintiff makes various allegations against defendant Marinelli, who is employed

by the Central New York Psychiatric Center ("CNYPC") and is assigned as a

---

[34] It is unclear whether plaintiff has mistaken the date upon which defendant Byno "sent" him to
OMH watch, or whether this happened twice, once on May 3, 2014 (Marinelli Decl. ¶ 8 - there is no
individual listed as the referring staff member) and then again on September 1, 2014, when the record
shows that defendant Byno referred plaintiff for the OMH watch.  Plaintiff claims that Nurse Byno was
the initial interviewer in May when he initially told the officers of his mental health issues, and it was
defendant Byno who suggested that he be placed on OMH watch. (AC ¶¶ 70, 72). The court notes,
however, that plaintiff claimed that he was sent to OMH watch on September 1, 2014 because he tried
to hang himself. The medical records indicate that, plaintiff talked about suicide and had a sheet
hanging in his cell, not that he attempted to hang himself. (*Compare* AC ¶ 97 *with* Byno Decl. Ex. A
("Inmate c/o 'hearing voices *thoughts of self-harm*' Had piece of sheet tied to cell door . . . .")
(emphasis added)).

[35] The court also notes, that to the extent that any of defendant Byno's conduct occurred on
September 1, 2014, rather than on the October dates, without a grievance to toll the statute of
limitations, any such claim would be time barred.

"Psychologist II" at Upstate. (Marinelli Decl. ¶ 1) (Dkt. No. 76-1).  Defendant Marinelli carries a caseload of inmates at Upstate who have mental health issues. (*Id.*)  Defendant Marinelli's duties included performing intake interviews to assess inmates' mental status. (*Id.*)  As part of his intake review, defendant Marinelli asks the inmates whether they have any past history of suicide, and he also has access to the inmate's institutional file so that he is aware of the inmate's needs and requirements prior to his arrival at Upstate. (Marinelli Decl. ¶ 5).

Defendant Marinelli states that, if an individual expresses suicidal ideation, he is immediately taken to the infirmary and placed on "observation watch" until the staff determines that the individual is no longer a threat to himself. (Marinelli Decl. ¶ 6).  Generally, the watch lasts a day or two. (*Id.*)  When the infirmary staff makes the determination that the individual is no longer a danger to himself, then he is taken to his assigned cell. (Marinelli Decl. ¶ 7).  If he is still exhibiting suicidal tendencies, the inmate may be continued on watch at the infirmary, or if appropriate, transferred to an OMH satellite unit at a different facility. (*Id.*)  In any event, an inmate is not released from the infirmary if he is still exhibiting suicidal tendencies. (*Id.*)

Although defendant Marinelli does not remember the specifics of any interaction he may have had with the plaintiff, the medical records indicate that plaintiff was transferred to the infirmary upon his arrival at Upstate on May 3, 2014 because he stated that he was suicidal. (Marinelli Decl. ¶ 8).  He was released on May 5, 2014 and was transferred to his assigned cell. (*Id.*)  Defendant Marinelli has attached a copy of plaintiff's progress notes while he was on observation from May 3 until May 5. (Marinelli Decl. Ex. A).  Defendant Marinelli states that he would not have played any

part in the decision to release the plaintiff to his cell because only the staff at the infirmary are authorized to make that determination. (Marinelli Decl. ¶ 9). None of the progress notes are signed by defendant Marinelli, and all of the notes indicate that plaintiff was in no distress, was resting "well," and denied any complaints. (Marinelli Decl. Ex. A).

Plaintiff was released from the infirmary on May 5, 2014. In the amended complaint, plaintiff states that he told defendant Sergeant Maynard that he was "homicidal" and would hurt someone else, not that he was suicidal. (AC ¶ 73). Plaintiff never alleges that he was placed for any period of time with another inmate, and it is clear from the discussion below that it was ultimately decided to place plaintiff in a single cell. Thus, defendant Maynard is not responsible for any alleged denial of mental health care.

On the morning of May 6, 2014, plaintiff self-inflicted a razor cut to his inner left wrist.[36] (Marinelli Decl. Ex. B). Plaintiff was treated for the cut in the infirmary at 8:40 a.m. (*Id.*) The medical records state that the cut was one half inch long and one millimeter deep. (Marinelli Ex. B). The wound was cleaned, a dressing applied, and "OMH notified." (*Id.*) Defendant Marinelli saw plaintiff prior to his cutting his wrist and again after the incident in his cell at 9:00 a.m. (Marinelli Decl. Ex. C). Defendant Marinelli's progress note states that the wound was treated with "cleaning and band-aid." (*Id.*) The plaintiff told defendant Marinelli that he cut his wrist because he was

---

[36] Defendant Marinelli has no independent recollection of this interaction with plaintiff, but the medical records are clear in their description of the events of May 6, 2014, including the timing of various actions. (Marinelli Decl. ¶ 14 & Exs. B, C).

"depressed and needs to be alone." (*Id.*)  Defendant Marinelli stated that he had seen

plaintiff prior to the wrist cutting incident, and at that time, plaintiff told Marinelli that

he was homicidal, and needed to be single-celled, denied suicidal thoughts, said he was

hearing voices, but then signed his treatment plan. (*Id.*)

When defendant Marinelli arrived at plaintiff's cell after the wrist cutting

incident, his notes indicate that he observed plaintiff speaking with the officers who

were delivering breakfast. (Marinelli Decl. Ex. C).  Plaintiff's interaction with the

officers was normal, and his interaction with Marinelli was normal, answering

questions appropriately, and maintaining good eye contact, "with no signs of psychosis,

depression, or anxiety." (*Id.*)  Plaintiff told defendant Marinelli that he was "homicidal"

and did not want a "bunky."  Plaintiff was told by security that he would be returned to

his cell and that he would be single-celled. (*Id.*)  As a result, "Pt now says he will not

need omh again.  Pt says not suicidal." (*Id.*)  Defendant Marinelli noted that he would

follow up on SHU rounds. (*Id.*)

Defendant Marinelli states that, based on his progress notes, which articulate his

interaction with the plaintiff, and the medical records indicating that plaintiff's cut was

small with minimal bleeding, it was his "professional opinion as Psychologist II," that

plaintiff's cut did not "constitute grounds for further action." (*Id.*)  The plaintiff's

medical records indicate that he was seen on May 7, 2014, complaining only of a dry

scalp and acne. (Marinelli Decl. Ex. B).

It appears from the records that defendant Marinelli did not make the decision to

release the plaintiff from the infirmary.  However, he visited plaintiff on the morning of

May 6, and plaintiff denied suicidal ideation.  Rather, he claimed that he was homicidal

and wished to have a single cell.  Defendant Marinelli did not give plaintiff a razor, nor would he have known that defendant Winston was making rounds offering inmates razors because it was "shower day."

Defendant Winston is a corrections officer and is not a medical provider. "'Nonmedical personnel engage in deliberate indifference where they intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to attendant prison personnel.'" *Bookman v. Lindstrand*, No. 9:15-CV-1542 (MAD/DEP), 2018 WL 3121688, at *12 (N.D.N.Y. Feb. 14, 2018), *report and recommendation adopted*, 2018 WL 1470585 (N.D.N.Y. Mar. 26, 2018) (quoting *Baumann v. Walsh*, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999)).  In his declaration, defendant Winston states that he would not have given plaintiff a razor if he had known that plaintiff might use it to harm himself. (Winston Decl. ¶ 8).  Instead, the proper procedure would have been to alert a sergeant. (*Id.*)  Plaintiff does not claim that he told defendant Winston that he was suicidal prior to the razor being given to plaintiff. (AC ¶ 79).  The cut that plaintiff sustained was small, and he did not suffer significant harm.  Thus, neither defendant Winston, nor defendant Marinelli exhibited deliberate indifference to plaintiff's medical needs.

After the cutting incident, defendant Marinelli made the professional decision, based on the evidence, that plaintiff's cut was not a suicide attempt, there was no reason for further intervention, and that there was no significant risk involved.  The subsequent medical records support his determination.  Thus, defendant Marinelli did not act with deliberate indifference to plaintiff's serious medical needs after the incident.  Plaintiff's disagreement with the care he received or with defendant Marinelli's decision does not

rise to the level of constitutionally inadequate care. To the extent that defendant Marinelli was negligent (a finding that this court does not make), such negligence does not rise to the level of a constitutional violation. Any medical care claims may be dismissed as to defendants Marinelli and Winston relative to any incidents occurring in early May of 2014.

Plaintiff also alleges that on May 21, 2014, he had a video conference with a psychiatrist, who changed the dosage of plaintiff's medication. (AC ¶ 120). Plaintiff claims that defendant Marinelli encouraged plaintiff to stop taking his mental health medications even though they were working. (*Id.*) However, plaintiff does not indicate that he acted on defendant Marinelli's suggestion. Plaintiff then states that on May 28, 2014, defendant H. Baker gave plaintiff a large pill that did not look familiar, and he had an adverse reaction to the pill. (AC ¶ 121). Plaintiff states that on May 29, 2014, defendant H. Baker gave him a yellow pill, and although plaintiff questioned why the pill was yellow, he took the pill, but it made plaintiff throw up and have a migraine headache. (AC ¶ 122). On June 2, 2014, plaintiff asked an unidentified nurse about the colors of the pills, and she suggested that if he had a problem, he should write to the Nurse Administrator. (AC ¶ 123). Apparently, on June 3, 2014, defendant H. Baker gave plaintiff the correct pill, but plaintiff suspects that it was because defendant H. Baker had another nurse with him. (AC ¶ 124).

Plaintiff alleges that on June 10, 2014, defendant Marinelli stopped at the plaintiff's cell and told him that defendant Barkman dismissed the "homicidal tickets" that plaintiff received in the beginning of May. Defendant Marinelli also asked whether plaintiff was going to "sign off" on his "meds," but plaintiff said "no." (AC

¶ 125).  Defendant Marinelli asked plaintiff whether he was breaking "the deal," and plaintiff said yes. (*Id.*)  Plaintiff claims that he told defendant Marinelli about the different color medications,[37] but that defendant Marinelli said "maybe it's a sign," and winked when plaintiff asked if he had anything to do with "it."[38] (AC ¶ 126).  Defendant Marinelli told plaintiff that if he "signed off" on his medications, he would see a doctor immediately, and he told plaintiff he had three days to think about it. (*Id.*)

Plaintiff alleges that on June 11, 2014, defendant H. Baker came to plaintiff's cell, and plaintiff accused Baker of giving him the wrong medications and told defendant H. Baker that he would not take any more medications from him. (AC ¶ 127). Plaintiff states that the next day he received a letter indicating that one of his medications was now orange. (AC ¶ 128).  Plaintiff claims that a nurse told him that evening that H. Baker had discontinued his medication. (AC ¶ 129).  Plaintiff stated that "it usually takes 3 refusals in a row to have M.H.U. meds discontinued." (*Id.*) Plaintiff states that he filed various grievances regarding these issues, which were all consolidated, but he has not submitted any of these grievances for the court's review.

In his declaration, defendant Marinelli states that in his position as Psychologist II, he had no authority to discontinue medications. (Marinelli Decl. ¶ 17).  Only a treating psychiatrist has the authority to do so.  To the extent that medication is discontinued, it may be done for a variety of reasons, including plaintiff's refusal to

---

[37] Plaintiff appears to suspect that he was being given the wrong medications because they were the wrong color. (AC ¶ 126).

[38] Plaintiff apparently believes that this "wink" indicated confirmation of his involvement with the medication tampering. (*See also* Pl.'s Dep. 159-60).

take the medication. (*Id.*)  Plaintiff accuses defendant H. Baker of discontinuing his medications based on deliberate indifference.  However, it is clear from the amended complaint that plaintiff believed he was getting the wrong medications.[39]  He was upset because, after telling defendant H. Baker that he was no longer going to accept medication from him, the medications were "discontinued" too soon because plaintiff should have had the chance to "refuse" his medication three times.[40]  In addition, as a nurse, defendant H. Baker had no authority to discontinue medications. (H. Baker Decl. ¶ 10).

Plaintiff's claims against Lieutenant Barkman, and Sergeant P. Baker are all based on vague allegations that plaintiff mentioned to them that he had mental health problems.[41] (AC ¶¶ 79-83).  Neither officer had any authority over plaintiff's mental health care, and it is clear from the evidence presented that, at the same time, plaintiff's mental health needs were being monitored by medical personnel.  Thus, plaintiff's claims of the denial of constitutionally adequate medical care may be dismissed as against defendants Barkman, H. Baker, and P. Baker.

---

[39] This is even assuming that plaintiff's allegations are true.

[40] It is not clear that plaintiff's medications were discontinued, or that as a nurse, defendant H. Baker could discontinue the medication.  But, what is clear is that plaintiff admits that he told defendant H. Baker that he would no longer accept medications from him.

[41] Plaintiff states that when defendant Winston came back after plaintiff cut himself, he took plaintiff for an interview with defendant Barkman, who told him to stop cutting himself.  Later, plaintiff states that he told Sergeant P. Baker and Nurse H. Baker that he felt suicidal. (AC ¶ 80). Plaintiff states that Sergeant Baker sent plaintiff to an interview room after he was bandaged, and plaintiff told defendant Barkman that he was not getting the appropriate mental health treatment. (AC ¶ 82).  Finally, plaintiff claims that defendant Sergeant Baker came into the room, and plaintiff told him all about his prior mental health problems and the problems with his cell. (AC ¶ 83).  There is no indication that either defendant had any authority to change plaintiff's care or were deliberately indifferent to a serious risk.

Finally, plaintiff alleges that defendant H. Baker refused to properly assess plaintiff's injuries after the alleged sexual assault on September 2, 2014. (AC ¶¶ 106-107).  During plaintiff's deposition, plaintiff testified that the first time that he asked for medical assistance and saw defendant H. Baker after the assault was "ten days after the incident." (Pl.'s Dep. at 124).  Plaintiff claims that, at sick call on September 10, 2014,[42] defendant H. Baker walked away when plaintiff tried to explain that he was in pain after the sexual assault, and later refused to take pictures of his anus and his testicles to avoid documenting the injury. (AC ¶¶ 106-107).

In his declaration, defendant H. Baker states that he has no recollection of interacting with plaintiff on September 10, 2014. (H. Baker Decl. ¶ 8).  However, he states that the policy at Upstate is that no photographs of injuries are taken during sick call, and that as a nurse, defendant H. Baker was not authorized to send any inmate to an outside provider. (*Id.*)  Thus, defendant H. Baker could not have taken pictures of plaintiff's injuries during sick call, even if plaintiff requested such photographs to be taken, and defendant H. Baker was not personally responsible for any failure to refer plaintiff for treatment by an outside provider.

The medical records attached to defendant H. Baker's declaration show that plaintiff was seen on September 8, 2014 by Nurse Holcombe. (H. Baker Decl. Ex. A).  Nurse Holcombe is not a defendant in this action, and the note indicates that there were no complaints of medical needs voiced or noted. (*Id.*)  There are two entries for September 10, 2014.  The first states that there was "NSC" (no significant change), and

---

[42] Although plaintiff's deposition testimony refers to "ten days after the incident," the medical records indicate that plaintiff saw H. Baker on sick call September 10, 2014. (H. Baker Decl. Ex. A).

that plaintiff "refused to answer assessment questions." (*Id.*)  The second entry notes that H. Baker "viewed [plaintiff] in holding pen per security request. Inmate claims sexual assault by staff on 9/2/14." (*Id.*)  The note indicates that plaintiff was "fully assessed," and that there was "no indication of trauma or injury found during [the] assessment." (*Id.*)  It seems unusual that, if plaintiff were suffering as he says, he would not have mentioned it to the nurse who he saw on September 8, 2014, instead of telling him or her that he had no "medical needs." There is no indication that even if defendant H. Baker failed to take photographs of plaintiff's injuries, or failed to "treat" plaintiff on September 10, 2014, that defendant H. Baker exhibited deliberate indifference to plaintiff's serious medical needs.  The amended complaint may thus be dismissed as against defendant H. Baker.

## V.  **Retaliation**

### A.    **Legal Standards**

To state a First Amendment claim of retaliation, an inmate must allege facts plausibly suggesting that (1) he engaged in speech or conduct that was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected conduct and the adverse action. *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014)(citations omitted).  The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration."  *Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013) (quoting *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003)).  In other words, we must examine prisoners' claims of retaliation with "skepticism and particular care."  *Rivera v. Goord*, 119 F. Supp 2d 327, 339 (S.D.N.Y.

2000) (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).  Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations," and not stated in "wholly conclusory terms."  *Dolan v. Connolly,* 794 F.3d 290, 295 (2d. Cir. 2015) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 (2002)).

In order to satisfy the final prong, "the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Cruz v. Grosso,* No. 9:13-CV-30 (FJS/TWD), 2014 WL 2176256, at *6 (N.D.N.Y. May 23, 2014) (citing *inter alia Colon,* 58 F.3d at 873).  Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, including temporal proximity between the protected activity and the alleged retaliatory act, and statements by the defendant concerning his or her motivation. *Cruz,* 2014 WL 2176256, at *6 (citing *Colon,* 58 F.3d at 872-73).  However, temporal proximity alone is not enough to establish a causal connection.  The Second Circuit has held that where "timing is the only basis for a claim of retaliation . . . an inference of retaliation does not arise." *Thomas v. Waugh,* No. 9:13-CV-0321 (MAD/TWD), 2015 WL 5750945, at *15 (N.D.N.Y. Sept. 30, 2015) (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001).

Even where plaintiff can make a showing of retaliatory motive, the defendant may be entitled to summary judgment if she can show that the alleged retaliatory action would have occurred even without the improper motivation. *Greer v. Mehiel*, 805 F. App'x 25, 29 (2d Cir.), *cert. denied*, 141 S. Ct. 136 (2020), *reh'g denied*, 141 S. Ct. 217 (2020) (citing *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt.*

*Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). *See also Jordan v. Bd. of Elections*, 816 F. App'x 599, 602-603 (2d Cir. 2020); *Osborne v. Harris*, No. 9:20-CV-673 (TJM/ATB), 2021 WL 1131413, at *11 (N.D.N.Y. Jan. 15, 2021) (citations omitted), *report-recommendation adopted*, 2021 WL 1124575 (N.D.N.Y. Mar. 24, 2021).  The defendant bears the burden of making the showing that she would have taken exactly the same action in the absence of an improper motive. *Greer*, 805 F. App'x at 29 (citing *Scott*, 344 F.3d at 288).

### B.    Analysis

#### 1.    Defendants Bernier and Nelson (Freedom of Information ("FOIL") Requests (Claim #2)

Plaintiff claims that defendants Denise Bernier and Tracy Nelson retaliated against plaintiff for filing grievances by failing to provide plaintiff with requested video footage under FOIL, destroying the relevant footage after this litigation began, and overcharging plaintiff for FOIL requests. (AC ¶ 419).  Defendant Bernier was the Offender Rehabilitation Coordinator ("ORC") Supervisor and FOIL Officer at Upstate before she retired in April of 2016. (Bernier Decl. ¶ 1) (Dkt. No. 75-7).  Tracy Nelson took over the position from defendant Bernier at that time, but for a short time prior to defendant Bernier's retirement, she and defendant Nelson worked together. (*Id.* & Nelson Decl. ¶ 1 (Dkt. No. 75-5)).

Although plaintiff claims that defendant Bernier denied plaintiff FOIL requests in retaliation for some grievance that he filed against her, the evidence does not support plaintiff's allegations.  First, plaintiff alleges that defendant Bernier failed to produce his requested materials before he ever allegedly filed a grievance against her. (AC

¶ 211-12) (plaintiff filed grievance because defendant Bernier failed to produce requested materials).  In any event, on April 22, 2016, after plaintiff filed his grievance, and defendant Bernier was no longer working at Upstate, defendant Nelson met with plaintiff to discuss his complaints. (Nelson Decl. ¶ 7 & Ex. A).  The records show that between January 15, 2016 and April 11, 2016, plaintiff filed *twelve* FOIL requests. (Nelson Decl. Ex. A).  Of those twelve requests, only two were outstanding at the time of the review, and they were filed 10 days prior to plaintiff's meeting with defendant Nelson. The rest had been fulfilled, most of which were requests for videotaped materials. (*Id.*)  Defendant Nelson states that she followed up with plaintiff on May 10, 2016 and June 6, 2016 to keep him informed about the status of his open requests. (Nelson Decl. ¶ 8).  Other than plaintiff's unsupported assertion that the FOIL requests were denied due to his grievance against defendant Bernier, there is absolutely no support for his claims.  Plaintiff's concern that the materials were not produced quickly enough may not form the basis for a retaliation claim.  Plaintiff has not alleged any adverse effects of the timing of the FOIL production.

To the extent that plaintiff claims that videos were "destroyed," defendant Bernier states that it is the Department of Corrections and Community Supervision ("DOCCS") policy to retain video tapes for a period of one year. (Bernier Decl. ¶ 8). This action was commenced in October of 2017.  To the extent that videos were deleted, there is no indication that this law suit was the cause of such elimination.  As shown above, the plaintiff was given several videos between January and April of 2016. There is no indication that any videos were destroyed for any reason related to this plaintiff.

Plaintiff also claims that he was overcharged for FOIL materials in retaliation for his grievances. Defendant Bernier asserts that she was not involved in the determination of the charges for FOIL requests. (Bernier Decl. ¶ 9-10). The copies of requested video footage and their cost calculations were approved by a Captain within the FOIL Guidance Department. Then, defendant Bernier, in her role as a FOIL Officer, communicated the results of the FOIL request, and corresponding charge, set and approved by the Captain, to the requesting inmate via FOIL Request Receipts. (Bernier Decl. ¶ 9). Defendant Bernier declares that she had no responsibility for setting the cost or method of cost calculation. (Bernier Decl. ¶ 10).

Defendant Nelson states that, prior to August of 2017, Upstate had a policy whereby inmates who requested video footage were charged based on the amount of time that an employee worked to produce the materials. (Nelson Decl. ¶ 9). At that rate, the price of one of plaintiff's requests was close to $100.00. (*Id.*) After August of 2017, pursuant to a New York State Court order, Upstate was directed to stop charging inmates based upon an employee's hours of labor. (Nelson Decl. ¶ 10; Bernier Decl. ¶ 11). As a result, the plaintiff's charge was reduced accordingly, and defendant Nelson states that she modified the charges for all incarcerated individuals. (*Id.*)

It is clear from the evidence presented that neither defendant Bernier, nor defendant Nelson were responsible for the charges incurred by plaintiff for his FOIL requests. As stated above, a defendant must be personally responsible for the alleged constitutional violation. *Tangretti, supra.* When the court ordered a change in the method of cost calculation, defendant Nelson adjusted the costs for all inmates affected by the overcharge. Plaintiff has failed to raise a genuine issue of material fact regarding

his retaliation claims against defendants Bernier and Nelson relative to his FOIL requests.

### 2.    Defendants Bernier, LeClerc, and Nelson (Sex Offender Counseling and Treatment Placement ("SOCTP")) (Claim #2)

Plaintiff alleges that he was placed in the Sex Offender Counseling and Treatment Program ("SOCTP") by defendants Bernier, LeClerc, and Nelson in retaliation for his grievances.  Plaintiff argues that he should not have been placed in the program because his crime of conviction was not a sex offense.  The court must first point out that plaintiff's due process claims with respect to this issue have been dismissed.  Only plaintiff's retaliation claims survive.

Plaintiff has mistaken the criteria for placement in the program.  Defendant LeClerc is the Offender Rehabilitation Coordinator ("ORC") at Upstate. (LeClerc Decl. ¶ 1) (Dkt. No. 75-8).  Defendant LeClerc states that, at the time of the incidents herein, the Central Office SOCTP staff reviewed an inmate for potential placement based on various criteria, including a guilty disciplinary disposition for a sex offence, threats to commit a sex offence, penal law offense of a sexual nature or an attempt to commit such an offense. (LeClerc Decl. ¶ 5).  Thus, contrary to plaintiff's assertion, referral to the SOCTP is not dependent solely upon the inmate's crime of conviction, but it may also be based upon the inmate's behavior while incarcerated. (LeClerc Decl. ¶ 5 & Ex. A ¶ 6 (Program Eligibility)).

Defendant LeClerc states that an inmate's programming is reviewed every quarter to determine whether he is receiving the programming suitable to his needs. (LeClerc Decl. ¶ 6).  When defendant LeClerc reviewed plaintiff's file, she determined

that he had received three misbehavior reports for lewd conduct, two while he was at Great Meadow, and one while he was at Green Haven. (LeClerc Decl. ¶ 6 & Ex. B (Disciplinary History)).  In accordance with DOCCS policy, defendant LeClerc indicated that plaintiff might be suitable for placement in the SOCTP, and referred the file to her supervisor, defendant Bernier. (LeClerc Decl. ¶ 7).  Defendant Bernier then referred plaintiff's file to the Central Office Guidance and Counseling Unit, requesting that plaintiff be reviewed for placement in the SOCTP. (LeClerc Decl. ¶ 8).

On March 28, 2016, the Central Office Staff made the determination that plaintiff's placement in SOCTP was appropriate, and defendant LeClerc so informed the plaintiff. (LeClerc Decl. ¶ 9).  When plaintiff questioned the timing of the referral, defendant LeClerc told him that the referral should have been made at his prior facility, but it may have been overlooked. (LeClerc Decl. ¶ 10).  On September 14, 2017, Jeff McCoy, the Deputy Commissioner for Program Services, wrote to plaintiff informing him that his placement in SOCTP was appropriate given his disciplinary history. (LeClerc Decl. ¶ 11 & Ex. C).  Deputy Commissioner McCoy's letter to plaintiff makes the department's reasoning quite clear.  The disciplinary determinations for lewd conduct which influenced the determination were not made at Upstate, and most of them took place before plaintiff was ever incarcerated at Upstate.  Thus, is it clear that plaintiff's placement in the SOCTP would have been made regardless of any "retaliatory"[43] motive.  Thus, any claims of retaliation against defendants Bernier, LeClerc, and Nelson may be dismissed.

---

[43] This court does not find that a retaliatory motive existed.

### 3.    Defendants Gokey and Smith (Cell 15 Placement) (Claim # 8)

Plaintiff appears to allege that defendants Gokey and Smith had plaintiff placed in a cell next to Inmate Reeder in retaliation for a grievance or grievances.  The amended complaint states generally that plaintiff was told that "security," meaning "sergeants in 11 building" made the decision to have plaintiff single-celled, and they were moving him to Cell #15. (AC ¶ 89).  During his deposition, plaintiff further speculated on who "security" was.[44] (Pl.'s Dep. at 148).  Plaintiff also speculates in the amended complaint that "staff knows and is fully aware" of Inmate Reeder's behavior, and inmates who filed grievances are placed in the next cell in order to deprive them of sleep and psychologically torture them. (AC ¶ 93).

In the factual recitation of plaintiff's claims, he does not identify "staff," other than to say "sergeants in 11 building" were retaliating against him for filing "grievances," nor does he state to which grievances he was referring.  In the "Causes of Action" section of the amended complaint, plaintiff states that defendant L. Gokey and R. Smith were responsible for placing plaintiff in Cell #15 next to Inmate Reeder. (AC ¶ 414).  However, during his deposition, plaintiff testified that he never had a problem with Sergeant L. Gokey before plaintiff was placed in Cell #15. (Pl.'s Dep. at 149).  Plaintiff stated that he "actually thought she was a decent sergeant." (*Id.*)  Plaintiff appears[45] to have also testified that he never had a problem with Sergeant Smith prior to

---

[44] Plaintiff testified that "security is -- Sergeant security is Sergeant Gokey. Security is Sergeant Eddie [sic]; security is Sergeant Smith." (Pl.'s Dep. at 148).

[45] Plaintiff's testimony was very unclear at various times during his deposition.  He tended to ramble when he was asked a question, and it was not always clear to what question his answers referred.

his placement in Cell #15. (Pl.'s Dep. at 149-50). He stated that he never had a problem, but once he started filing grievances, "that's when everything began with these people." (Pl.'s Dep. at 150).

During his deposition, plaintiff testified that although he had never filed a grievance against Sergeant L. Gokey, he filed a grievance against "her husband." (Pl.'s Dep. 152-53). Defendant Laura Gokey has filed a declaration, stating that in 2014, she was a Sergeant at Upstate. (Gokey Decl. ¶ 1) (Dkt. No. 75-3). Sergeant Gokey states that in 2014, Upstate was full, there were limited options for placing inmates,[46] and the plaintiff's placement was not solely her determination. (Gokey Decl. ¶¶ 5-6). Defendant L. Gokey also states that she is **not** married to defendant M. Gokey. (Gokey Decl. ¶ 11). Thus, plaintiff's pure speculation that Sergeant L. Gokey's "decision" to place plaintiff in Cell #15 was somehow in retaliation for a grievance against M. Gokey because he was her husband is clearly baseless. In any event, it is unclear when plaintiff would have filed a grievance against M. Gokey since plaintiff's claims against defendant M. Gokey are that he was involved in an assault on plaintiff in *September* of 2014. Plaintiff's placement in Cell # 15 was in May of 2014. Thus, plaintiff had not yet filed a grievance against defendant M. Gokey, and no defendant could have been retaliating for a grievance which had not yet been filed.

During his deposition, plaintiff was asked whether he ever filed a grievance against defendant Smith, and plaintiff responded that he had filed a grievance against

---

[46] Although not stated by defendant L. Gokey in her declaration, it is also clear, as discussed above, that plaintiff told corrections personnel that he was homicidal, and the decision was made that plaintiff needed to be placed in a single cell, which could also have influenced the plaintiff's placement.

defendant Smith in *2013* at Upstate. (Pl.'s Dep. at 153). Plaintiff's claims against defendant Smith relative to Cell # 15 placement occurred in May of 2014, after he was transferred from another facility early in the month. Defendant Smith also states that the decision where to place an inmate would not have been his alone. (Smith Decl. ¶ 5). Inmates were placed in cells based upon an inmate's height, weight, and known gang affiliation, and in plaintiff's case, the housing would have to be a single cell based on the statements he made to corrections personnel. (*Id.*)

Defendant Smith also states that during 2014, Upstate was full, and there were limited options for the placement of inmates. (Smith Decl. ¶ 7). Inmate Reeder was a "single-cell" inmate. (Smith Decl. ¶ 6). Plaintiff's status as a "single-cell" inmate also influenced the placement. While plaintiff's complaints about needing a single-cell may have gotten him that designation,[47] they may also have been instrumental in his placement next to Inmate Reeder.[48] There is no indication that defendant Smith was responsible for placing plaintiff in a cell in proximity to Inmate Reeder in retaliation for any grievances that plaintiff might have filed. Defendants have presented evidence showing that there is no question of material fact regarding plaintiff's retaliation claim, and plaintiff has failed to respond to their motion. Thus, plaintiff's retaliation claim

---

[47] It appears from defendant Marinelli's notes that plaintiff made many of his comments for purposes of obtaining a single cell. (Marinelli Decl. Ex. C - plaintiff told staff that he was homicidal and did not want a "bunky," but after he was told that he would get his single cell, he told staff that he would no longer need "OMH." (*Id.*)

[48] Defendant Smith states that Upstate is a "double bunk" facility, and only "some" inmates at Upstate are designated to a single cell. Inmate Reeder was one of those inmates. (Smith Decl. ¶¶ 5, 6).

against defendants L. Gokey and R. Smith may be dismissed.[49]

## VI.    Excessive Force (Claim # 3)

### A.    Legal Standards

Inmates enjoy Eighth Amendment protection against the use of excessive force,

and may recover damages under 42 U.S.C. § 1983 for a violation of those rights.

*Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).  To sustain a claim of excessive force, a

plaintiff must still establish the objective and subjective elements of an Eighth

Amendment claim.  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

In order to satisfy the objective element of the constitutional standard for

excessive force, a defendant's conduct must be "'inconsistent with the contemporary

standards of decency.'"  *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted);

*Hudson*, 503 U.S. at 9.  The malicious use of force to cause harm constitutes a per se

Eighth Amendment violation, regardless of the seriousness of the injuries.  *Blyden*, 186

F.3d at 263 (citing *Hudson*, 503 U.S. at 9).  "The Eighth Amendment's prohibition of

'cruel and unusual' punishments necessarily excludes from constitutional recognition

*de minimis* uses of physical force, provided that the use of force is not of a sort

repugnant to the conscience of mankind."  *Hudson*, 503 U.S. at 9-10 (citations omitted).

"'Not every push or shove, even if it may later seem unnecessary in the peace of a

---

[49] The defendants have also argued that any retaliation claims against defendants L. Gokey and R. Smith are time-barred because the plaintiff's cause of action accrued in May of 2014, and plaintiff filed this action in October of 2017.  As discussed above, this would be true if plaintiff did not actively pursue a grievance against these two defendants which would have tolled the statute of limitations for as long as the grievance was pending, including any appeals to the CORC.  Although plaintiff states generally that he filed many grievances, there is no indication that he filed a grievance against defendants L. Gokey and R. Smith, specifically referencing retaliation for his placement next to Reeder.  The statute of limitations would be an additional basis for dismissal of this claim.

judge's chambers, violates a prisoner's constitutional rights.'" *Sims*, 230 F.3d at 22
(citation omitted).  With respect to this element, the law is clear that "a claim of
excessive force may be established even if the victim does not suffer 'serious' . . . or
'significant' injury, . . . provided that the amount of force used is more than 'de
minimis,' or involves force that is 'repugnant to the conscience of mankind.'" *Hudson*,
503 U.S. at 7-10.

     The subjective element requires a plaintiff to demonstrate the "necessary level of
culpability, shown by actions characterized by wantonness." *Id*. at 21 (citation
omitted).  The wantonness inquiry "turns on 'whether force was applied in a good-faith
effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"
*Id*.  (quoting *Hudson*, 503 U.S. at 7).  In determining whether defendants acted in a
malicious or wanton manner, the Second Circuit has identified five factors to consider:
the extent of the injury and the mental state of the defendant; the need for the
application of force; the correlation between that need and the amount of force used;
the threat reasonably perceived by the defendants; and any efforts made by the
defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d
282, 291 (2d Cir. 2003).

     **B.    Analysis**

     Plaintiff claims that defendant M. Gokey and other unidentified correctional
officers attacked him, beat him, and sexually assaulted him on September 2, 2014.
Once again, defendants argue that plaintiff's claim is time-barred because the claim
would have accrued on September 2, 2014, and he did not file this action until October
2, 2017.  In the alternative, they argue that plaintiff has failed to properly assert the

personal involvement of defendant Gokey in the alleged assault.

Plaintiff claims that he filed grievances complaining about the September 2nd assault and specifies the numbers that were assigned to those grievances. (AC ¶¶ 110-11). Defendants have not alleged, or supported any allegations, that plaintiff failed to bring grievances relating to the assault.[50] Thus, the court will proceed to the issue of personal involvement.

It was apparent from plaintiff's deposition, that plaintiff did not know defendant M. Gokey. (Pl.'s Dep. at 82). Plaintiff stated that he did not know which one was Michael Gokey, but he was "definitely in the vicinity." (*Id.*) Plaintiff also stated "a lot of inmates say he was Michael Gokey, but I'm not . . . that's what the inmates say." (Pl.'s Dep. at 92). Plaintiff stated that defendant M. Gokey was always in O.B.S., and that he was there "at the situation because the way how [sic] Ms. Gokey, his wife when I – when the – when the situation got brought up, that's how I kind of figured it." (Pl.'s Dep. at 95). "He's known for this type of stuff." (*Id.*)

Plaintiff testified that when he told another inmate what happened, the other inmate told plaintiff that Michael Gokey did the same thing to him, and that it was his "M.O." with the inmates. (Pl.'s Dep. at 96). That is why plaintiff was "almost positive" M. Gokey was there, but admitted that he did not know for sure, and that another

---

[50] The court has stated above that, it is the plaintiff's burden to establish equitable or other tolling for the statute of limitations. Unlike the claims above, where plaintiff generally asserted or failed to assert that he brought a grievance, here, plaintiff has listed grievance numbers. It would have been easy for defendants to make an argument that such grievance did not exist or that the grievance did not toll the statute of limitations. Defendants did not address equitable tolling in their statute of limitations argument. In any event, because the plaintiff's claim fails on the issue of personal involvement, the court will not recommend dismissal based on the statute of limitations.

inmate gave him the name. (*Id.*)  Plaintiff stated that "it could possibly be Gokey," but "I don't know." (Pl.'s Dep. at 97-98).  He stated that "I'm telling you information that -- what other inmates is telling me.  Like every time this type of stuff came up, like he's known for the -- that type of stuff, whatever." (Pl.'s Dep. at 98).

Defendant Gokey has submitted a declaration stating that on September 2, 2014, he was a corrections officer at Upstate. (M. Gokey Decl. ¶ 1) (Dkt. No. 75-4). However, September 2, 2014 was defendant Gokey's regular day off, and therefore, could not have been involved in an excessive force incident on that day. (M. Gokey Decl. ¶ 5).  Moreover, defendant Gokey states that when he was on duty during September of 2014, he was assigned to the 5:00 a.m. to 1:00 p.m. shift outside the facility, working with inmates who were assigned to a work crew. (M. Gokey Decl. ¶ 6).  Defendant M. Gokey also confirms that he is not, nor was he ever, married to Sergeant L. Gokey. (M. Gokey Decl. ¶ 7).  Finally, defendant M. Gokey specifically asserts that he did not assault, or otherwise use force on plaintiff on September 2, 2014. (M. Gokey Decl. ¶ 8).

Plaintiff has failed to respond to the defendants' motion for summary judgment. It is the plaintiff's burden to establish that the defendant was personally involved in any alleged constitutional violation.  It is clear from plaintiff's own statements at his deposition that he only named defendant M. Gokey because some other inmate or inmates mentioned his name and somehow assumed because M. Gokey and defendant L. Gokey share the same name, they were married, and that he somehow was assaulting plaintiff because of that relationship.  Defendants have established that there is no question of material fact regarding the personal involvement of defendant M. Gokey,

and the plaintiff's excessive force claim against him may be dismissed for lack of personal involvement.

    **WHEREFORE**, based on the findings above, it is

    **RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 75) be **GRANTED**, and the amended complaint **DISMISSED IN ITS ENTIRETY as against all remaining defendants.**

    Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: October 15, 2021

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**